## MADDEN, EXECUTOR, *v.* KENTUCKY, BY REEVES, COMMISSIONER OF REVENUE.

No. 92. Argued December 14, 1939.—Decided January 29, 1940.

*Mr. Leo T. Wolford,* with whom *Mr. Wm. Marshall Bullitt* was on the brief, for appellant.

*Mr. Samuel M. Rosenstein,* with whom *Messrs. Clifford E.. Smith, Joseph J. Leary,* and *Harry D. Kremer* were on the brief, for appellee.

MR. JUSTICE REED delivered the opinion of the Court.

This is an appeal [1] brought here under § 237 (a) of the Judicial Code from a judgment of the Court of Appeals of Kentucky sustaining the validity of a statute of that state against an attack by the appellant on the ground of its being repugnant to the due process, equal protec-

[1] See Act of January 31, 1928, 45 Stat. 54.

tion, and privileges and immunities clauses of the Fourteenth Amendment of the Constitution of the United States.

The issue is whether a state statute which imposes on its citizens an annual ad valorem tax on their deposits in banks outside of the state at the rate of fifty cents per hundred dollars and at the same time imposes on their deposits in banks located within the state a similar ad valorem tax at the rate of ten cents per hundred dollars is obnoxious to the stated clauses of the Fourteenth Amendment. The relevant provisions of the Kentucky statutes for the period in question appear in the note below.[2]

The opinion of the Court of Appeals of Kentucky in this case construes the exception in § 4019, limiting the tax on bank deposits to one-tenth of one per cent, as applicable only to depositors in local financial institutions organized under the laws of Kentucky or under the na-

---

[2] Carroll's Kentucky Statutes, Baldwin's Revision, 1930, § 4019a–10, p. 2052 (Ky. Acts, 1924, Ch. 116, § 3) provides:

"All property subject to taxation for state purposes shall be subject also to taxation in the county, city, school, or other taxing district in which same has a taxable situs, except the following classes of property which shall be subject to taxation for state purposes only:

.  .  .  .  .

"(4) Money in hand, notes, bonds, accounts and other credits, whether secured by mortgage, pledge, or otherwise, or unsecured, and shares of stock; . . ."

Carroll's Kentucky Statutes, Baldwin's Revision 1930, § 4019, p. 2048 (Ky. Acts 1924, Ch. 116, § 1, p. 402, as reënacted in Ky. Acts 1926, Ch. 164, p. 739), provides as follows:

"An annual ad valorem tax for state purposes of thirty cents (30¢) upon each one hundred dollars ($100.00) of value of all real estate directed to be assessed for taxation, as provided by law and fifty cents (50¢) upon each one hundred dollars ($100.00) of value of all other property directed to be assessed for taxation, as provided by law, shall be paid by the owner, person or corporation assessed; except a tax at the rate of one-tenth of one percent (0.1%) [i. e., 10

tional banking laws. This interpretation of the state laws is of course accepted by us.[3]

John E. Madden died in November, 1929, a citizen and resident of Fayette County, Kentucky. On several prior assessment dates, July 1 in Kentucky, Mr. Madden had on deposit in New York banks a considerable amount of funds. These deposits had not been reported for the purposes of taxation in Kentucky. That state brought suit against Mr. Madden's executor to have these deposits assessed as omitted property and to recover an ad valorem tax of 50 cents per hundred dollars as of July 1 of each year, together with interest and penalties. The executor used as one defense against this claim the contention that a tax on deposits in banks outside of Kentucky at a higher rate than the tax upon bank deposits within Kentucky would abridge decedent's privileges and immunities as a citizen of the United States, deprive him of his property right and the liberty to keep money on deposit outside of Kentucky without due process of law, and deny to him equal protection of the law in violation of the Fourteenth Amendment. The Court of Appeals passed upon the constitutional questions submitted because of the difference in taxing rate between Kentucky deposits and out-of-state deposits. It approved the classification as permissible under the due process and equal protection clauses and refused to accept the argument that its interpretation of the statutes violated the privileges and immunities clause.

I. *Classification.*—The broad discretion as to classification possessed by a legislature in the field of taxation

cents upon each $100] shall be paid annually upon the amount of deposits in any bank, trust company, or combined bank and trust company, organized under the laws of this State, or in any national bank of this State as now provided by law; . . ."

[3] *St. Louis S. W. Ry. Co.* v. *Arkansas*, 235 U. S. 350, 362; *Storaasli* v. *Minnesota*, 283 U. S. 57, 62.

88

has long been recognized.[4] This Court fifty years ago concluded that "the Fourteenth Amendment was 'not intended to compel the State to adopt an iron rule of equal taxation,"[5] and the passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.[6] Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.[7] The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.[8]

Paying proper regard to the scope of a legislature's powers in these matters, the insubstantiality of appellant's claim that he has been denied equal protection or due process of law by the classification is at once apparent. When these statutes were adopted in 1917 during a general revision of Kentucky's tax laws, the chief problem facing the legislature was the formulation of an

[4] *New York Rapid Transit Corp.* v. *New York,* 303 U. S. 573, and cases there cited.

[5] *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237.

[6] *Citizens' Telephone Co.* v. *Fuller,* 229 U. S. 322, 329.

[7] See the opinion of Mr. Justice Brandeis in *Louisville Gas & Electric Co.* v. *Coleman,* 277 U. S. 32, 42, 46–47.

[8] *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79.

enrorceable system of intangible taxation.[9] By placing the duty of collection on local banks, the tax on local deposits was made almost self-enforcing. The tax on deposits outside the state, however, still resembled that on investments in *Watson* v. *State Comptroller*, the collection of which was said to depend "either upon [the taxpayer's] will or upon the vigilance and discretion of the local assessors."[10] Here as in the *Watson* case the classification may have been "founded in 'the purposes

[9] Because of a prohibition in the Kentucky Constitution of 1891 against classification in taxation, the state and its political subdivisions taxed intangibles at the same rate as other property. This resulted in a total tax of about $2.65 per hundred dollars on intangibles, a tax which in the case of bank deposits almost equaled the interest on deposits. The high rate led to widespread evasion of the tax by concealment of intangibles; with bank deposits this took the form of withdrawals for deposits outside the state. The unequal burden which this evasion placed on other forms of property led to agitation for reform as early as 1908. Two special tax commissions reported on the need for a constitutional amendment and a general tax reform. After an amendment permitting classification was adopted in 1916, a third committee made specific proposals for revision, and most of the recommendations were adopted at a special legislative session in 1917. See the message of Governor Stanley to the General Assembly of 1917, Kentucky Senate Journal of 1917, p. 13. In general the revision took the form of a drastic lowering of the rates on intangibles. An even lower rate was placed on bank deposits and almost complete collection assured by placing the duty of collection on the banks.

The studies which led to the general revision of 1917 may be found in Report of the Kentucky Tax Commission for 1909; Report of the Special Tax Commission of Kentucky for 1912–14; Report of the Kentucky Tax Commission for 1916. A careful examination of the workings of the revised system has been made by Dr. Simeon E. Leland. The Taxation of Intangibles in Kentucky, Bulletin of the Bureau of Business Research, College of Commerce, University of Kentucky, vol. 1, no. 1 (1929).

[10] 254 U. S. 122, 124.

and policy of taxation.' " The treatment accorded the two kinds of deposits may have resulted from the differences in the difficulties and expenses of tax collection.[11]

II. *Privileges and Immunities.*—The appellant presses urgently upon us the argument that the privileges and immunities clause of the Fourteenth Amendment of the Constitution of the United States[12] forbids the enforcement by the Commonwealth of Kentucky of this enactment which imposes upon the testator taxes five times as great on money deposited in banks outside the State as it does on money of others deposited in banks within the State. The privilege or immunity which appellant contends is abridged is the right to carry on business beyond the lines of the State of his residence, a right claimed as appertaining to national citizenship.

There is no occasion to attempt again an exposition of the views of this Court as to the proper limitations of the privileges and immunities clause. There is a very recent discussion in *Hague* v. *C. I. O.*[13] The appellant purports to accept as sound the position stated as the view of all the justices concurring in the *Hague* decision. This position is that the privileges and immunities clause protects all citizens against abridgement by states of rights of national citizenship as distinct from the fundamental or

---

[11] *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 511.

[12] The 14th Amendment, § 1, provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ."

[13] 307 U. S. 496. The prior cases are collected in Note 2 of the dissenting opinion in *Colgate* v. *Harvey* (296 U. S. 404, 445) and Note 1 of Mr. Justice Stone's opinion in the *Hague* case (307 U. S. 496, 520).

natural rights inherent in state citizenship.[14]  This Court declared in the *Slaughter-House Cases*[15] that the Fourteenth Amendment as well as the Thirteenth and Fifteenth were adopted to protect the negroes in their freedom. This almost contemporaneous interpretation extended the benefits of the privileges and immunities clause to other rights which are inherent in national citizenship but denied it to those which spring from

---

[14] Mr. Justice Roberts' opinion, at p. 512: "Although it has been held that the Fourteenth Amendment created no rights in citizens of the United States, but merely secured existing rights against state abridgement, it is clear that the right peaceably to assemble and to discuss these topics, and to communicate respecting them, whether orally or in writing, is a privilege inherent in citizenship of the United States which the Amendment protects."

Mr. Justice Stone's opinion, at p. 519–21: "Hence there is no occasion . . . to revive the contention, rejected by this Court in the *Slaughter-House Cases*, that the privileges and immunities of United States citizenship, protected by that clause, extend beyond those which arise or grow out of the relationship of United States citizens to the national government.

"That such is the limited application of the privileges and immunities clause seems now to be conceded by my brethren."

[15] 16 Wall. 36, at 71–72:

"We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him. . . .

". . . And so, if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply though the party interested may not be of African descent. But what we do say, and what we wish to be

state citizenship.[16]   In applying this constitutional principle this Court has determined that the right to operate an independent slaughter-house,[17] to sell wine on terms of equality with grape growers[18] and to operate businesses free of state regulation[19] were not privileges and immunities protected by the Fourteenth Amendment.. And a state inheritance tax statute which limited exemptions to charitable corporations within the state was held not to infringe any right protected by the privileges and immunities clause.[20]   The Court has consistently refused to list completely the rights which are covered by the clause, though it has pointed out the type of rights protected.[21] We think it quite clear that the right to carry out an incident to a trade, business or calling[22] such as the deposit

---

understood is, that in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it."

[16] *Idem*, 78–79.

[17] *Slaughter-House Cases, supra.*

[18] *Cox* v. *Texas*, 202 U. S. 446; cf. *Bartemeyer* v. *Iowa*, 18 Wall. 129; *Crowley* v. *Christensen*, 137 U. S. 86; *Giozza* v. *Tiernan*, 148 U. S. 657; *Crane* v. *Campbell*, 245 U. S. 304.

[19] *Holden* v. *Hardy*, 169 U. S. 366; *Wilmington Star Mining Co.* v. *Fulton*, 205 U. S. 60; *Western Union Telegraph Co.* v. *Commercial Milling Co.*, 218 U. S. 406; *Rosenthal* v. *New York*, 226 U. S. 260; *Prudential Ins. Co.* v. *Cheek*, 259 U. S. 530.

[20] *Board of Education* v. *Illinois*, 203 U. S. 553; cf. *Ferry* v. *Spokane, P. & S. Ry. Co.*, 258 U. S. 314.

[21] They have been described as "privileges and immunities arising out of the nature and essential character of the national government, and granted or secured by the Constitution of the United States." *In re Kemmler*, 136 U. S. 436, 448. See also *Slaughter-House Cases, supra*, at 79–80; *United States* v. *Cruikshank*, 92 U. S. 542, 552; *Williams* v. *Fears*, 179 U. S. 270, 274; *Twining* v. *New Jersey*, 211 U. S. 78, 97.

[22] Cf. *Twining* v. *New Jersey*, 211 U. S. 78, 94.

of money in banks is not a privilege of national citizenship.

In the states, there reposes the sovereignty to manage their own affairs except only as the requirements of the Constitution otherwise provide. Within these constitutional limits the power of the state over taxation is plenary. An interpretation of the privileges and immunities clause which restricts the power of the states to manage their own fiscal affairs is a matter of gravest concern to them.[23] It is only the emphatic requirements of the Constitution which properly may lead the federal courts to such a conclusion.

Appellant relies upon *Colgate* v. *Harvey* [24] as a precedent to support his argument that the present statute is not within the limits of permissible classification and violates the privileges and immunities clause. In view of our conclusions, we look upon the decision in that case as repugnant to the line of reasoning adopted here. As a consequence, *Colgate* v. *Harvey* must be and is overruled.

*Affirmed.*

MR. CHIEF JUSTICE HUGHES concurs in the result upon the ground, as stated by the Court of Appeals of Kentucky, that the classification adopted by the legislature rested upon a reasonable basis.

MR. JUSTICE ROBERTS:

I think that the judgment should be reversed. Four years ago in *Colgate* v. *Harvey*, 296 U. S. 404, this court held that the equal protection clause and the privileges and immunities clause of the Fourteenth Amendment prohibit such a discrimination as results from the statute now under review. I adhere to the views expressed in

[23] *Twining* v. *New Jersey, supra,* 92.
[24] 296 U. S. 404.

94

the opinion of the court in that case, and think it should be followed in this.

MR. JUSTICE McREYNOLDS joins in this opinion.