**SPELLINGS et al. v. DEWEY et al. (RECONSTRUCTION FINANCE CORPORATION, Intervener).**

No. 11950.

Circuit Court of Appeals, Eighth Circuit.

Sept. 9, 1941.

Eugene R. Warren, of Little Rock, Ark. (W. H. Holmes, of Little Rock, Ark., on the brief), for appellants.

Charles D. Frierson, of Jonesboro, Ark. (Joe C. Barrett, of Jonesboro, Ark., and J. Bowers Campbell, of Washington, D. C., on the brief), for appellees.

Before GARDNER and JOHNSEN, Circuit Judges, and COLLET, District Judge.

JOHNSEN, Circuit Judge.

The dominating question is whether, in a proceeding for composition of the indebtedness of Drainage District No. 7 of Poinsett County, Arkansas, under the Act of August 16, 1937, as amended, 11 U.S. C.A. §§ 401–404, an order of the bankruptcy court, which attempted to preserve and protect the status of the Commissioners of the District, was an interference with the political or governmental powers of the District, in violation of the provisions of the Act, 11 U.S.C.A. § 403, subsections (c) and (i).

Subsection (c) provides that, in such a proceeding, "the judge * * * shall not, by any order or decree, in the proceeding or otherwise, interfere with (a) any of the political or governmental powers of the petitioner * * *". Subsection (i) further provides that "Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any municipality or any political subdivision of or in such State in the exercise of its political or governmental powers, including expenditures therefor."

During the pendency of the proceeding for composition of the District's indebtedness, the Commissioners of the District, who are the appellees here, sought to protect their official status, by application to the bankruptcy court for an injunction against the election commissioners of the county, and against the persons who had filed as candidates for Commissioners of the District in opposition to them at the general election to be held on November 5, 1940.

The petition, which was presented to the bankruptcy court four days before the election, alleged that irregularities were about to be committed in connection with the election, in that the election commissioners were intending to place the names of the candidates for Commissioners of the District upon the same ballot as the general offices of the County, instead of on a separate ballot; that no provision had been made for furnishing a certified list of the taxpayers of the District to the local election boards, to enable them to determine who were entitled to vote for the offices of Commissioners; and that ballots were going to be distributed to voting precincts outside the boundaries of the Drainage District, without any safeguard to prevent other persons than landowners and taxpayers of the District from voting on such offices, and with no means available to the present Commissioners to check such votes or to challenge or contest the result. The jurisdictional allegation was that a jeopardizing of the status of the present Commissioners would irreparably injure or prejudice the debt composition plans of the District and the refunding program in connection with the proceeding, which was then in the process of being completed.

The bankruptcy court entered an ex parte order on the petition, finding that the holding of an election in the manner alleged might do irreparable injury to the debt composition proceeding and to the District's refinancing plans, and restraining the election commissioners from holding any election for the offices of Commissioners of the District, unless they provided separate ballots and distributed them only in voting precincts located within the boundaries of the District, and required them to be furnished only to actual landowners and taxpayers of the District, as appearing on the certified lists to be provided for each voting precinct.

The election was held on November 5, 1940, and the unofficial returns indicated that the present Commissioners had been badly beaten by their opponents. Three days after the election, and before the official canvass was completed, the Commissioners filed another petition in the bankruptcy court, alleging that the election was invalid, on the grounds, among others, that the separate ballot on the offices of Com-

missioners, which had been provided by the election commissioners pursuant to the court's previous order, had not been furnished to all the voters of the District, but the election judges had attempted to distribute them to voters believed to be favorable to the opponents of the Commissioners; that the election judges paid no attention to the certified list of the qualified voters of the District and permitted ballots to be cast by persons who were not entitled to vote on the offices of Commissioners; and that ballots also were provided and cast in precincts outside the boundaries of the District. The prayer of the petition was that the election commissioners be restrained from attempting to canvass the ballots for the offices of Commissioners, and from certifying their opponents as having been elected to such offices; that their opponents be restrained from attempting to act as Commissioners and from interfering with their right to such offices, until the further order of the court; and that on final hearing such restraining order be made permanent and the present Commissioners be declared to be the proper holders of such offices. The jurisdictional ground alleged was that a certification of the election results and an attempt by their opponents to take over the offices of Commissioners would do irreparable injury to the debt composition proceeding and to the arrangements made to refinance the District's affairs through the Reconstruction Finance Corporation.

The bankruptcy court again entered an ex parte order, finding that, in view of the fact that a refunding bond issue of $300,-000 was in process of preparation for signature by the present Commissioners, and that "if other persons are placed in their stead said proceedings may be delayed or complicated to the irreparable injury of the said district and petitioners and to the refunding program", a restraining order should be issued as prayed.

The election commissioners and the opponents of the Commissioners, who are the appellants here, then filed a motion to dismiss the petition on the grounds that the

bankruptcy court was without jurisdiction of the subject matter; that no federal question was involved; that a determination of the validity of the election was not ancillary to the bankruptcy powers of the court; and that a plain and adequate remedy existed under the Arkansas statutes and in the courts of that state.

The Commissioners then filed a motion to consolidate an equity cause, in the nature of a creditor's bill, which had been brought against the District before institution of the proceeding for composition of the District's indebtedness, with the bankruptcy proceeding, "for the purpose of hearing their petition for permanent injunction herein". It appeared that in the equity suit, the court had appointed the Commissioners as formal receivers of the District, and that, in that capacity they were attempting to handle some condemnation proceedings and other litigation on behalf of the District, under some federal flood control legislation involving the St. Francis river. The bankruptcy court entered the order of consolidation. The Reconstruction Finance Corporation was permitted to intervene and to join with the Commissioners in their request for a permanent injunction.

On a hearing on the motion to dismiss their petition, the Commissioners then sought to have all the election proceedings declared a nullity by the bankruptcy court, on the ground that, under Acts 1927, No. 227, p. 778, the Arkansas legislature, some twelve years before, had deprived all special drainage districts[1] of the right to elect their Commissioners, and had made such districts subject to the general drainage district laws of the state, under which all vacancies and successions in the offices of Commissioners were to be filled by the County Court.[2] Such an allegation had been included in each of the two petitions which they had filed, but had apparently not previously been pressed.

The court held that under the 1927 statute the District no longer had the right to elect its Commissioners; that Acts of Arkansas 1939, No. 260, p. 626,[3] cured any

---

[1] Drainage District No. 7 of Poinsett County, Arkansas, was organized as a special drainage district under Acts 1917, No. 193, p. 1053.

[2] Pope's Ark. Dig. § 4458. See, also, Berry v. Cousart Bayou Drainage District, 181 Ark. 974, 28 S.W.2d 1060,

1062; Winton v. Bartlett, 181 Ark. 669, 27 S.W.2d 100, 101.

[3] This statute provided in part: "In any drainage district heretofore established which is now operating with a Board of Commissioners or directors consisting of five members, all of whom have

irregularities in the holding over of the Commissioners and validated their actions; that the public welfare of the District required that the functions and duties and authority of the Commissioners "be free from interference, so that they may execute resolutions, bonds, contracts and carry on litigation freely under the directions of the Reconstruction Finance Corporation and the United States engineers and this court"; and that "the defendants may file answer but the basis of this decision being that defendants have no valid title to the offices under the pretended election * * * there seems no reason to delay a final decree". A permanent injunction was then entered against appellants, enjoining the election board from certifying the results of the election, and further providing that "defendants and their agents all be and they are hereby enjoined from attempting to act as Commissioners * * * and from interfering in any way with (appellees) who are hereby declared to be the legal and qualified and acting Commissioners * * * and also receivers of this court, *and the court reserves jurisdiction to fill any vacancies hereafter occurring among said Commissioners and receivers till further order*". (Italics supplied.)

The situation presents such an unusual study in the exercise of local democratic process and judicial authority that a momentary digression is perhaps permissible. Although the right to elect Commissioners had apparently been abolished by the Arkansas legislature in 1927, the District had continued to exercise the privilege of suffrage on such offices, and the present Commissioners were content to accept the result, until it proved disappointing to them in the election of 1940. The Commissioners had also allowed themselves to be appointed formal receivers of the District in a credi-

tor's suit in equity, although Acts of Arkansas 1933, No. 46, § 1 provided that "all laws providing for or authorizing the appointment of a receiver for any such district [levee, drainage and road] are hereby repealed, and no court shall appoint a receiver to collect levee, drainage or road district taxes".[4] The court in this case presumably sought to bolster up its bankruptcy powers, by consolidating the equity receivership suit with the bankruptcy proceeding. Finally, by an order in bankruptcy, the title of the Commissioners to their offices was purportedly quieted, and the court reserved "jurisdiction to fill any vacancies hereafter occurring among said Commissioners", notwithstanding the prescription of the Arkansas statutes that "if a majority in value of the owners of real property in the district shall petition for the appointment of particular persons as commissioners, it shall be the duty of the county court or county judge to appoint the persons so designated", and that "the county court shall remove any member of the board on the petition of a majority in value of the owners of real property in the district".[5]

But we have, of course, no actual concern here with any question except that of whether the bankruptcy court, "by any order or decree, in the proceeding or otherwise", has interfered with any of the political or governmental powers of the District, in violation of 11 U.S.C.A. § 403, subsections c and i. We think it clear that it has. Subsection c was apparently designed to avoid any construction of possible control over or right of interference with local political or governmental powers, on which ground an earlier municipal debt readjustment statute[6] had been declared void by the Supreme Court.[7] "The [present] statute is carefully drawn so as not to impinge upon the sovereignty of the State."[8]

---

taken the oath required by law, said five Commissioners or directors may continue to serve for the terms prescribed by law and the acts of such five member Boards are hereby validated."

[4] Pope's Ark. Dig. § 4591. See, also, Rogers Paving Improvement District No. 13 v. Swofford, 193 Ark. 260, 99 S.W.2d 577, and Drainage District No. 2 v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 69 F.2d 138, construing this statute, and Dickinson v. Mingea, 191 Ark. 946, 88 S.W.2d 807, construing a similar statute.

[5] Pope's Ark. Dig. § 4458.

[6] Act of May 24, 1934, 48 Stat. 798, 11 U.S.C.A. §§ 301–303.

[7] Ashton v. Cameron County Water Improvement District No. 1, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309.

[8] United States v. Bekins, 304 U.S. 27, 51, 58 S.Ct. 811, 815, 82 L.Ed. 1137. The report of the Committee on the Judiciary of the House of Representatives (quoted at page 51 of 304 U.S., at page 815 of 58 S.Ct., 82 L.Ed. 1137) had similarly declared: "The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise

The bankruptcy court could accordingly not interfere in any manner with the right of the District under the Arkansas statutes to choose or remove its Commissioners. While a drainage district is not, in a technical sense, a governmental subdivision of the state, it is quite clearly a public agency, upon which, and within its particular sphere, the legislature has conferred quasi-political rights and powers,[9] that cannot be impinged upon, under subsection c of § 403. The right and power of a majority in value of the landowners in the District to petition the county court, and to compel the appointment or removal of any or all of the Commissioners of the District, necessarily is as much of a quasi political or governmental right and power as that of direct election.[10] The bankruptcy court could not control or interfere with either. It had no jurisdiction to interfere in the election of November 5, 1940, no matter what irregularities were being threatened, and should have dismissed the original petition. It had no jurisdiction subsequently to pass upon the validity or invalidity of that election, for the purpose of fixing statuses between the rival claimants to office, as a matter of primary adjudication. It had no jurisdiction to prevent appellants or any one else from attempting to oust the present Commissioners from office. It had no jurisdiction to attempt to perpetuate such Commissioners in office, or to reserve "jurisdiction to fill any vacancies hereafter occurring among said Commissioners." If the equity court had jurisdiction to appoint the Commissioners as formal receivers of the District in the prior creditor's suit—which we are not called upon to determine—the official status of the Commissioners, as such, in the bankruptcy proceeding, could not be aided or affected by the somewhat unusual attempt to consolidate the equity and bankruptcy causes. The bankruptcy court could have no greater powers than were given it by the special statute under which it was authorized to act. The right to interfere with any of the political or governmental powers of the District was expressly denied it, and, indeed, could probably not be held to exist even in the absence of the prohibition.[11]

While we are not unmindful of the practical difficulties with which the court may have been confronted in the administration of the bankruptcy proceeding, the primary responsibility for the ultimate accomplishment of a debt composition rested on the District, which had instituted the proceeding. In any event, the court could not subordinate the political rights of the landowners of the District to its own convenience in desiring to have certain Commissioners available to sign refunding bonds.

The judgment is reversed and the cause remanded with directions to dismiss appellees' petitions.

Reversed with directions.

---

of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted." H.Rep. No. 517, 75th Cong., 1st Sess.

[9] " * * * local improvement districts and their commissioners are governmental agencies created as quasi public corporations deriving their powers directly from the Legislature and exercising them as the agent of the property owners in the district whose interests are affected by the duties they perform. They exercise no governmental powers except those expressly or impliedly granted by the Legislature. They are not political or civil divisions of the state like counties and municipal corporations created to aid in the general administration of the government." Drainage District No. 7 of Poinsett County v. Hutchins, 184 Ark. 521, 42 S.W.2d 996, 1000.

[10] The answer of appellants, which the final decree authorized them to file, alleged that approximately 75% of the taxpayers owning property within the District had petitioned the county court to remove appellees and to appoint appellants as Commissioners.

[11] "In the states, there reposes the sovereignty to manage their own affairs except only as the requirements of the Constitution otherwise provide." Madden v. Kentucky, 309 U.S. 83, 93, 60 S.Ct. 406, 410, 84 L.Ed. 590, 125 A.L.R. 1383.

"The sovereignty of the state essential to its proper functioning * * * cannot be taken away by any form of legislation." Ashton v. Cameron County Water Improvement District No. 1, 298 U.S. 513, 531, 56 S.Ct. 892, 896, 80 L.Ed. 1309.