MICHIGAN ASSOCIATION OF GOVERNMENTAL EMPLOYEES v
THE MICHIGAN CIVIL SERVICE COMMISSION

MICHIGAN STATE EMPLOYEES ASSOCIATION v THE
MICHIGAN CIVIL SERVICE COMMISSION

Docket Nos. 67467-67470. Submitted December 13, 1982, at Lansing.—
Decided April 25, 1983. Leave to appeal denied, 417 Mich 1095.

Plaintiffs, the Michigan Association of Governmental Employees
(MAGE), and others, commenced an action in the Ingham
Circuit Court seeking declaratory and injunctive relief from a
decision by defendant, the Michigan Civil Service Commission,
to rescind a previously authorized 5% wage increase and addi-
tion of vision care benefits for employees represented in the
suit by MAGE, consisting of state classified employees occupy-
ing supervisory, managerial and confidential positions. A simi-
lar action was commenced againt the Michigan Civil Service
Commission in the same court by plaintiffs, the Michigan State
Employees Association (MSEA), and others, on behalf of certain
employees not represented by an exclusive bargaining represen-
tative. The Governor was allowed to intervene as a defendant
in both cases. The trial court then consolidated the two cases.
The trial court, Ray C. Hotchkiss, J., held in favor of the
plaintiffs. Defendants appealed from the order to that effect.
The Court of Appeals, thereafter, granted the Governor's mo-
tion for immediate consideration and motion for stay pending
appeal. *Held:*

1. The Civil Service Commission had the authority to rescind
and defer the proposed increase even after the increase had
been considered by the Legislature.

2. Article 11, § 5, ¶ 7 of the 1963 Michigan Constitution
allows the Legislature to reject or reduce increases in rates of
compensation authorized by the Civil Service Commission. The
purpose of ¶ 7 is to protect against abuses by the commission in

REFERENCES FOR POINTS IN HEADNOTES
[1-3, 6] 15A Am Jur 2d, Civil Service § 48.
[4] 15A Am Jur 2d, Civil Service §§ 19, 22.
[5] 16A Am Jur 2d, Constitutional Law § 738.

increasing wages and against the resulting budgetary problems rather than to protect state employees. Therefore, there is no reason to read ¶ 7 as foreclosing later action by the commission to rescind an authorized increase which has not been vetoed by the Legislature. The Legislature was not given the power to propose or authorize increases in wages since that power belongs to the Civil Service Commission. Thus, the failure of the Legislature to exercise a veto should not necessarily be read as approval or as a mandate that salaries be maintained at that level. That would be reading too much into a simple power to protect the Legislature's budget and appropriations against abuses by the commission.

3. The Civil Service Commission's constitutional authority to regulate the conditions of employment in classified civil service is independent of and not limited by the provisions of Const 1963, art 5, § 20. Const 1963, art 5, § 20 should not be read as limiting the commission's authority to set wages pursuant to Const 1963, art 11, § 5. The commission's power to rescind the wage increase is independent of the Governor's responsibilities under Const 1963, art 5, § 20.

4. The commission's decision to defer wage increases to the supervisory, managerial and confidential employees represented by MAGE while not imposing similar unilateral deferrals on other employees did not deny the plaintiffs represented by MAGE the equal protection of the law.

5. The classification of the plaintiffs represented by MAGE as supervisory, managerial and confidential employees is not a suspect classification entitled to strict scrutiny by the courts. It is an economic or regulatory classification entitled only to minimal scrutiny by the courts.

6. There was a reasonable basis for treating employees covered by collective-bargaining agreements differently from those who were not covered by such agreements.

7. There is a rational basis for treating the supervisory, managerial and confidential employees as a group contractually and, therefore, plaintiffs were not denied equal protection by the commission's alleged decision to deny plaintiffs the right to a written fixed contract.

8. The Civil Service Commission acted within the scope of its authority under Const 1963, art 11, § 5, in rescinding and deferring the 5% wage increase and addition of vision care benefits for excluded and non-exclusively represented employees.

Reversed.

1. CONSTITUTIONAL LAW — STATE EMPLOYEES — WAGES — CIVIL
   SERVICE COMMISSION.

   The purpose of the constitutional provision which allows the
   Legislature to reject or reduce increases in rates of compensa-
   tion authorized by the Civil Service Commission is to protect
   the Legislature's budget and appropriations rather than to
   protect state employees; the provision should not be read as
   foreclosing later action by the commission to rescind an autho-
   rized increase in wages which has not been vetoed by the
   Legislature; the failure of the Legislature to exercise a veto
   should not necessarily be read as approval or as a mandate
   that salaries be maintained at that level (Const 1963, art 11,
   § 5, ¶ 7).

2. CONSTITUTIONAL LAW — STATE EMPLOYEES — WAGES — CIVIL
   SERVICE COMMISSION.

   The power to propose or authorize increases in wages to state
   employees belongs to the Civil Service Commission (Const 1963,
   art 11, § 5, ¶ 4).

3. CONSTITUTIONAL LAW — CIVIL SERVICE COMMISSION — STATE EM-
   PLOYEES — WAGES.

   The constitution provides that only the Governor, with the ap-
   proval of the appropriating committees of the Legislature, is
   authorized to reduce expenditures; however, that constitutional
   provision should not be read as limiting the Civil Service
   Commission's authority to set wages for state employees as
   provided in another constitutional provision, since the commis-
   sion's power to rescind a wage increase is independent of the
   Governor's responsibilities (Const 1963, art 5, § 20, art 11, § 5).

4. CONSTITUTIONAL LAW — STATE EMPLOYEES — CLASSIFICATION OF
   EMPLOYEES.

   The classification of certain state employees as supervisory, man-
   agerial and confidential employees is not a suspect classification
   entitled to strict scrutiny by the courts, but rather, is an
   economic or regulatory classification entitled only to minimal
   scrutiny by the courts.

5. CONSTITUTIONAL LAW — EQUAL PROTECTION.

   The equal protection guarantee of the Michigan Constitution does
   not bar all discrimination, but rather, bars only arbitrary and
   capricious discrimination not reasonably related to legitimate
   governmental objectives (Const 1963, art 1, § 2).

6. Constitutional Law — Civil Service Commission — State Employees — Wages — Wage Increase Deferral.

The Civil Service Commission acts within the scope of its constitutional authority where it defers a wage increase for certain state employees after the wage increase has been considered and not vetoed by the Legislature; such wage deferral is within the constitutional authority of the commission (Const 1963, art 11, § 5).

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *Maurice E. Schoenberger, Michael G. Lofgren* and *Ronald W. Bloomberg),* for Michigan Association of Governmental Employees, and others.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Michael E. Cavanaugh* and *Paula R. Latovick),* for Michigan State Employees Association.

*Warner, Norcross & Judd* (by *Roger M. Clark* and *Paul T. Sorensen),* for Civil Service Commission.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael J. Hodge* and *Gary P. Gordon,* Assistants Attorney General, for the Governor.

Before: R. M. Maher, P.J., and D. E. Holbrook, Jr., and P. J. Marutiak,* JJ.

P. J. Marutiak, J. The Michigan Association of Governmental Employees (MAGE), and others, commenced this action on September 9, 1982, seeking declaratory and injunctive relief from a decision by the Civil Service Commission to rescind a previously authorized 5% wage increase and addition of vision care benefits for state classified employees occupying supervisory, managerial and confidential positions. A similar action was com-

* Circuit judge, sitting on the Court of Apepals by assignment.

menced on September 13, 1982, by the Michigan State Employees Association (MSEA), and others, on behalf of certain employees not represented by an exclusive bargaining representative. On September 15, 1982, Governor Milliken filed a motion to intervene as a defendant in both cases. The motion was granted by the trial court and the two cases were consolidated. The trial court below held that the Civil Service Commission had exceeded its authority in rescinding the wage increase. The trial court subsequently ordered that the commission's action rescinding the 5% pay increase and vision care benefits for excluded (supervisory, managerial and confidential employees) and non-exclusively represented employees, scheduled to take effect on October 1, 1982, was "illegal, void and of no force and effect". On November 2, 1982, this Court granted the intervening defendant-appellant's motion for immediate consideration and motion for stay pending appeal.

The facts are not in dispute. The employees represented in this suit by MAGE are state classified employees occupying supervisory, managerial and confidential positions. These employees are excluded from collective bargaining and were affected by the commission's rescission of the 5% pay increase. The employees represented by MSEA have not elected an exclusive bargaining representative and were, therefore, also affected by the commission's decision to rescind the wage increase.

On October 29, 1981, the commission ratified two collective-bargaining agreements calling for a 5% wage increase and vision care benefits to become effective October 1, 1982. On December 18, 1981, the commission approved two more negotiated contracts containing the 5% increase and benefits and also approved the Coordinated Com-

pensation Plan recommended by the Employment Relations Board of the Civil Service Commission. This plan provided for a 5% wage increase and vision care benefits for all excluded and non-exclusively represented employees. As of December 18, 1982, 43,229 of the 60,066 state classified employees were scheduled to receive the general 5% wage increase and vision care benefits effective October 1, 1982. The remaining 16,837 exclusively represented employees had not begun negotiations.

The wage increases and vision care benefits were transmitted to the Legislature through the Governor's budget on January 25, 1982. House Concurrent Resolution 605 was passed by the Legislature on March 25, 1982. The resolution rejected the increase, but was contingent upon the employees covered by collective-bargaining agreements agreeing to contract modifications eliminating the increase within 15 days of the date of the resolution. The Office of the State Employer was unable to negotiate the concessions with all four of the unions having collective-bargaining agreements and, by its own terms, the resolution became null and void. In a letter dated March 28, 1982, the State Employer, on behalf of the Governor, asked the commission to consider a proposal to rescind the 5% wage increase. On August 10, 1982, the commission rescinded the wage increase and benefits with respect to all excluded and non-exclusively classified state employees who were not subject to collective-bargaining agreements and deferred the wage increase until the 1983-84 fiscal year. As a result of these events, approximately 1/3 of the 60,066 state classified employees received the 5% wage increase and vision care benefits on October 1, 1982, while the remainder, including those represented by plaintiffs herein, did not.

Plaintiffs argued in the trial court and on appeal that the Civil Service Commission exceeded its authority in rescinding the authorized wage increase after it had been considered by the Legislature. In addition, MAGE argues on behalf of the excluded employees that the commission's decision denied them equal protection of the law. Defendants appeal as of right from the trial court's decision in favor of plaintiffs.

The Civil Service Commission was established in 1940 by art 6, § 22 of the 1908 Michigan Constitution. Article 11, § 5, ¶ 4 of the 1963 Constitution confers on the commission broad authority over the state's civil service system:

"The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service."

Article 11, § 5, ¶ 7 of the 1963 Constitution contains language which allows the Legislature to reject or reduce increases in rates of compensation authorized by the commission. Paragraph 7 provides:

"Increases in rates of compensation authorized by the commission may be effective only at the start of a fiscal year and shall require prior notice to the governor, who shall transmit such increases to the legislature as part of his budget. The legislature may, by a majority vote of the members elected to and serving in each house, waive the notice and permit increases in rates of com-

pensation to be effective at a time other than the start of a fiscal year. Within 60 calendar days following such transmission, the legislature may, by a two-thirds vote of the members elected to and serving in each house, reject or reduce increases in rates of compensation authorized by the commission. Any reduction ordered by the legislature shall apply uniformly to all classes of employees affected by the increases and shall not adjust pay differentials already established by the civil service commission. The legislature may not reduce rates of compensation below those in effect at the time of the transmission of increases authorized by the commission."

It is this Court's opinion that the commission had the authority to rescind and defer the proposed increase even after it was considered by the Legislature. Prior to the inclusion of ¶ 7 in the 1963 Constitution, the commission had absolute authority to set compensation at any time during the course of a fiscal year without legislative oversight. At the 1961 Constitutional Convention, Delegates Hatch, Shackleton and Shaffer proposed the addition of what is now ¶ 7. Delegate Hatch explained the addition as follows:

"First, I would like to explain briefly just what this amendment would do. As you will see, it only affects increases in rates of compensation for classified personnel. Presently, the civil service commission has the absolute power to fix rates of compensation in any amount and at any time it desires, free from legislative control or accountability.

"This amendment would require several things. First of all, it would require that any proposed increases made by the civil service commission be submitted with the governor's budget. Now, this has been the practice for the past 2 or 3 years. However, we are dealing primarily here in what I would consider statutory language. There is nothing in the present constitution to require the commission to continue the practice that

they followed in the past few years, or to prevent them from reverting to the practice of declaring a pay raise at any time. This would make it crystal clear that any proposed increases in rates of compensation must be submitted with the governor's budget.

"Then these rates or increased rates would take effect only at the beginning of the next fiscal year. In other words, if a proposed increase were submitted with the governor's budget in January, it would not take effect until July 1 of that year. Also, the rates would take effect, upon the failure of the legislature, within 60 days after submission of this recommendation, to either reject, modify or reduce the amount recommended by the commission.

"The amendment gives the legislature this power to reject, modify or reduce increases in rates of compensation where there is a 2/3 vote of the members elected, if you will, in each house. In other words, in order to defeat a recommendation of the civil service commission as to pay raises, 2/3 of the senate would have to reject it, 2/3 of the house would have to reject, modify or reduce it.

"Additionally, the amendment would prohibit the legislature from reducing rates of compensation in effect at the time of the submission of the commission's recommendations to the legislature. In other words, the legislature would not be given the authority, even with a 2/3 vote, of going below those rates of compensation which are in effect at the time of a proposed increase.

"Now, it is sincerely believed that this proposed amendment is not a drastic one; it is not a radical one, but it is offered for the following reasons:

"It is believed that no governmental unit should be free from the time tested and proven checks and balances inherent in our constitutional form of government. Since the civil service commissioners are appointed for 8 year terms, they truly are not accountable to the governor, particularly a governor of short duration. Although the legislature presently has the power to fix the total appropriation within a given agency, it has no method of controlling abuses in a salary classifi-

cation which could occur in the future. In recognition of the fact that commissioners are but mere human beings and, as such, subject to error, it is felt that they should be accountable to the people for their actions, and this, I believe, is accomplished through giving the legislature a veto power. Now, for those who favor retention of this power by the civil service commission—in other words, the right to fix compensation—it should be pointed out that civil service retains the initiating power to raise rates under the proposed language. Also, as a practical proposition, the requirement of a 2/3 vote of both houses to reject, modify or reduce the commission's recommendation means that the veto power could not be exercised readily, and would undoubtedly be exercised only in the event of a real abuse by the commission." 1 Record of the Constitutional Convention of 1961, p 652.

Paragraph 7 gives the Legislature a narrowly drawn veto power over increases in wages to state employees. Delegate Hatch's remarks suggest that the purpose of the paragraph was to protect against abuses by the commission in increasing wages and against the resulting budgetary problems. Viewing the purpose of the paragraph as protecting the Legislature's budget and appropriations rather than protecting state employees, there would seem to be no reason to read the paragraph as foreclosing later action by the commission to rescind an authorized increase which has not been vetoed by the Legislature. The Legislature was not given the power to propose or authorize increases in wages; that power belongs to the commission under art 11, § 5, ¶ 4. Nor should the failure of the Legislature to exercise a veto be necessarily read as approval (the Legislature may only veto an increase by a 2/3 vote of the members of each house), or as a mandate that salaries be maintained at that level. That would be reading too

much into a simple power to protect the budget against abuses by the commission.

Plaintiffs argue that the commission's actions were subject to the requirements of art 5, § 20, since the commission was motivated by the desire to reduce expenditures because of the state's fiscal crises. However, only the Governor, with the approval of the appropriating committees of the Legislature, is authorized to reduce expenditures under art 5, § 20. Plaintiffs argue that the commission has no such power and, therefore, its actions were unconstitutional.

Const 1963, art 5, § 20, provides:

"No appropriation shall be a mandate to spend. The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes."

A similar argument was unanimously rejected by a panel of this Court in *Crider v Michigan,* 110 Mich App 702; 313 NW2d 367 (1981), where civil service employees argued that six one-day layoffs of employees in 1981, ordered by the Civil Service Commission, did not comply with Const 1963, art 11, § 5 and Const 1963, art 5, § 20. This Court found that:

"The *CSC's constitutional authority to regulate the conditions of employment in classified civil service is independent from and not limited by the provisions of Const 1963, art 5, § 20.* Accordingly, if the CSC's imple-

mentation of the layoff plan was permissible under art 11, § 5, it is not necessary for us to consider the effect of the failure of the Governor to comply with the conditions of art 5, § 20 of the Michigan Constitution. This follows by virtue of the fact that it is the Civil Service Commission, and not the Legislature, that is given 'supreme power' over civil service employees under art 11, § 5. *Welfare Employees Union v Civil Service Comm,* 28 Mich App 343; 184 NW2d 247 (1970)." (Emphasis added.) 110 Mich App 723.

We agree with the *Crider* Court's reasoning. Const 1963, art 5, § 20 should not be read as limiting the commission's authority to set wages pursuant to Const 1963, art 11, § 5. The commission's power to rescind the wage increase is independent of the Governor's responsibilities under art 5, § 20.

MAGE and others argue on behalf of the supervisory, managerial and confidential employees that the commission's decision to defer wage increases to the excluded employees while not imposing similar unilateral deferrals on other employees denied plaintiffs equal protection of the law. The non-exclusively represented employees do not raise this issue on appeal. About 1/3 of the approximately 60,000 state classified employees received the wage increase and benefits. The remainder, including the excluded employees, the non-exclusively represented employees and the employees covered by collective-bargaining agreements who either agreed to forego the wage increase or did not negotiate an increase in the first place, did not receive the increase in benefits.

The classification of plaintiffs as supervisory, managerial and confidential employees is not a suspect classification entitled to strict scrutiny. It is an economic or regulatory classification and as such is entitled only to minimal scrutiny. *Michi-*

*gan State Employees Ass'n v Michigan Employ-*
*ment Security Comm,* 94 Mich App 677; 290 NW2d
729 (1980). In *Tomlinson v Tomlinson,* 338 Mich
274, 278; 61 NW2d 102 (1953), the Supreme Court
stated:

"On the narrower phase of the question we merely
observe that the guaranty of equal protection of the law
is not one of equality of operation or application to all
citizens of the State or nation, but rather one of equal-
ity of operation or applicability within the particular
class affected, which classification must, of course, be
reasonable."

The equal protection guarantee does not bar all
discrimination, only arbitrary and capricious dis-
crimination not reasonably related to legitimate
governmental objectives. *Welfare Employees Un-
ion v Civil Service Comm,* 28 Mich App 343; 184
NW2d 247 (1970); *Crider, supra.*

In *Michigan State Employees Ass'n, supra,* pp
684-685, this Court discussed the application of the
rational basis test to legislation as follows:

"Thus, the 'any rational basis' test has been applied
principally to legislation dealing with social, economic,
fiscal and regulatory matters. In applying this standard
to cases challenging these types of statutes the Supreme
Court has not only entertained a presumption of consti-
tutionality, *e.g., McGowan v Maryland,* 366 US 420,
425-426; 81 S Ct 1101; 6 L Ed 2d 393 (1961); *Madden v
Kentucky,* 309 US 83, 88; 60 S Ct 406; 84 L Ed 590; 125
ALR 1383 (1940), and placed the burden on the chal-
lenging party to show that the law has no reasonable
basis, *Lindsley v Natural Carbonic Gas Co,* 220 US 61;
31 S Ct 337; 55 L Ed 369 (1911), but has in fact upheld
the legislation in nearly every challenge brought under
the equal protection clause. Note: *Developments in the
Law; Equal Protection,* 82 Harv L Rev 1065, 1087
(1969). The standard of 'minimal scrutiny' has been

applied in recent years to uphold various economic and social legislation."

A similar equal protection argument was raised by the plaintiffs in *Crider.* Those plaintiffs were also not protected by collective-bargaining agreements. In *Crider,* the Civil Service Commission imposed six one-day layoffs for state classified employees in an effort to ease the state's severe financial situation. Employees covered by collective-bargaining agreements, employees providing essential services and employees whose salaries were fully reimbursed by the federal government were not laid off. This Court noted that the objective of having the collective-bargaining agreements was a legitimate one and held that the dissimilar treatment did not violate the equal protection guarantee:

"We do not agree with plaintiffs, the amicus curiae, and the trial judge that the three classifications of employees exempted from the layoff program are unreasonable or arbitrary. The first classification, pertaining to those classified civil servants who are covered by a collective-bargaining agreement limiting the right to layoff, is related to the objective of honoring the government's contractual obligations. Plaintiffs cannot reasonably contend that the object of this exemption is not a legitimate one. Had the CSC chosen to implement a program that would have breached its bargaining agreements with certain employees, it would have been exposed to the costs of defending an unfair labor practice charge as well as charges of breach of contract." 110 Mich App 726.

Plaintiffs argue that because their classification as employees occupying supervisory, managerial and confidential positions bore no reasonable relationship to the commission's objective of granting

a uniform general wage increase, the classification was arbitrarily applied to deny them the right to receive the increase. However, the commission's objective was to defer the previously authorized wage increase, not to increase wages. The question becomes, as in *Crider,* whether there was a reasonable basis for treating those employees covered by collective-bargaining agreements differently from those who were not. We find that the commission had a legitimate interest in not breaching the collective-bargaining agreements with those bargaining units which did not voluntarily agree to modify their contract to eliminate the 5% wage increase and vision care benefits.

MAGE argues on behalf of the excluded employees that *Crider* can be distinguished from this case because here the plaintiffs are arguing that they were arbitrarily denied the same right to receive an executed contract as employees subject to collective-bargaining agreements. If they had such a contract, the commission would not have been able to rescind the wage increase and benefits.

The kind of contract these plaintiffs received, whether it was a fixed-term executed contract or not, and the terms of that contract flowed from their classification as supervisory, managerial and confidential employees. They do not contend that their classification was unreasonable or that they should be allowed to bargain collectively. Each group of employees, the various collective-bargaining units, the excluded employees, and the non-exclusively represented employees, is treated separately for contractual purposes. There is a rational basis for this different treatment between one classification of employees and another. If there were not, the commission would have to give the best of all contracts to all employees, regardless of

classification. Since there is a rational basis for treating the supervisory, managerial and confidential employees as a group contractually, plaintiffs were not denied equal protection by the commission's alleged decision to deny plaintiffs the right to a written fixed contract. *Tomlinson, supra.*

We find that the Civil Service Commission acted within the scope of its authority under Const 1963, art 11, §5 in rescinding and deferring the 5% wage increase and addition of vision care benefits for excluded and non-exclusively represented employees. We also find that the commission's actions did not deny the excluded employees the equal protection of the law.

Reversed.