ChieF Justice Roberts,
with whom Justice Scalia and Justice Alito join, dissenting.
Twenty-three years ago, we released a succinct and unanimous opinion striking down a property tax scheme in West Virginia on the ground that it clearly violated the Equal Protection Clause. Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U. S. 336 (1989). In Allegheny Pittsburgh, we held that a county failed to comport with equal protection requirements when it assessed property taxes primarily on the basis of purchase price, with no appropriate adjustments over time. The result was that new property owners were assessed at “roughly 8 to 35 times” the rate of those who had owned their property longer. Id., at 344. We found such a “gross disparit[y]” in tax levéis could not be justified in a state system that demanded that “taxation ... be equal and uniform.” Id., at 338; W. Va. Const., Art. X, §1. The case affirmed the commonsense proposition that the Equal Protection Clause is violated by state action that deprives a citizen of even “rough equality in tax.treatment,” when state law itself specifically provides that all the affected taxpayers are in the same category for tax purposes. 488 U. S., at 343; see Hillsborough v. Cromwell, 326 U. S. 620, 623 (1946) (“The equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class”).
*689 In this case, the Brisbane/Manning Sanitary Sewers Project allowed 180 property owners to have their homes hooked up to the city of Indianapolis’s (City) sewer system under the State’s Barrett Law. That law requires sewer costs to “be primarily apportioned equally among all abutting lands or lots.” Ind. Code § 36-9^39-15(b)(3) (2011). In the case of Brisbane/Manning, the cost came to $9,278 for each property owner. Some of the property owners — petitioners here— paid the full $9,278 up front. Others elected the option of paying in installments. Shortly after hookup, the City switched to a new financing system and decided to forgive the hookup debts of those paying on an installment plan. The City refused, however, to refund any portion of the payments made by their identically situated neighbors who had already paid the full amount due. The result was that while petitioners each paid the City $9,278 for their hookups, more than half their neighbors paid less than $500 for the same improvement — some as little as $309.27. Another quarter paid les.s than $1,000. Petitioners thus paid between 10 and 30 times as much for their sewer hookups as their neighbors.
In seeking to justify this gross disparity, the City explained that it was presented with three choices: First, it could have continued to collect the installment plan payments of those who had not yet settled their debts under the old system. Second, it could have forgiven all those debts and given equivalent refunds to those who had made lump-sum payments up front. Or third, it could have forgiven the future payments and not refunded payments that had already been made. The first two choices had the benefit of complying with state law, treating all of Indianapolis’s citizens equally, and comporting with the Constitution. The City chose the third option.
And what did the City believe was sufficient to justify a system that would effectively charge petitioners 80 times more than their neighbors for the same service — when state *690 law promised equal treatment? Two things: the desire to avoid administrative hassle and the “fiscal[] challeng[e]” of giving back money it wanted to keep. Brief for Respondents 35-36. I cannot agree that those reasons pass constitutional muster, even under rational basis review.
The City argues that either of the other options for transitioning away from the Barrett Law would have been “immensely difficult from an administrative standpoint.” Id., at 36. The Court accepts this rationale, observing that “[o]rdinarily, administrative considerations can justify a tax-related distinction.” Ante, at 682. The cases the Court cites, however, stand only for the proposition that a legislature crafting a tax scheme may take administrative concerns into consideration when creating classes of taxable entities that may be taxed differently. See, e. g., Lehnhausen v. Lake Shore Auto Parts Co., 410 U. S. 356, 359 (1973) (a State may “draw lines that treat one class of individuals or entities differently from the others”); Madden v. Kentucky, 309 U. S. 83, 87 (1940) (referring to the “broad discretion as to classification possessed by a legislature”); Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 510-511 (1937) (discussing permissible considerations for the legislature in establishing a tax scheme).
Here, however, Indiana’s tax scheme explicitly provides that costs will “be primarily apportioned equally among all abutting lands or lots.” Ind. Code §36-9-39-15(b)(3) (emphasis added). The legislature has therefore decreed that all abutting landowners are within the same class. We have never before held that administrative burdens justify grossly disparate tax treatment of those the State has provided should be treated alike. Indeed, in Allegheny Pittsburgh the county argued that its unequal assessments were based on “[ajdministrative cost[]” concerns, to no avail. Brief for Respondent, O. T. 1988, No. 87-1303, p. 22. The reason we have rejected this argument is obvious: The Equal Protection Clause does not provide that no State shall “deny *691 to any person within its jurisdiction the equal protection of the laws, unless it’s too much of a bother.”
Even if the Court were inclined to decide that administrative burdens alone may sometimes justify grossly disparate treatment of members of the same class, this would hardly be the case to do that. The City claims it cannot issue refunds because the process would be too difficult, requiring that it pore over records of old projects to determine which homeowners had overpaid and by how much. Brief for Respondents 36. But holding that the City must refund petitioners’ overpayments would not mean that it has to refund overpayments in every Barrett Law project. The Equal Protection Clause is concerned with “gross” disparity in taxing. Because the Brisbane/Manning Project was initiated shortly before the Barrett Law transition, the disparity between what petitioners paid in comparison to their installment plan neighbors was dramatic. Not so with respect to, for example, a project initiated 10 years earlier, because for those projects even installment plan payers will have largely satisfied their debts, resulting in far less significant disparities.
To the extent a ruling for petitioners would require issuing refunds to others who overpaid under the Barrett Law, I think the City workers are up to the task. The City has in fact already produced records showing exactly how much each lump-sum payer overpaid in every active Barrett Law project — to the penny. Record in Cox v. Indianapolis, No. 1:09-cv-0435 (SD Ind.), Doc. 98-1 (Exh. A). What the City'employees would need to do, therefore, is cut the checks and mail them out.
Certainly the job need not involve the complicated procedure the Court describes in an attempt to bolster its administrative convenience argument. Under the Court’s view the City would apparently continue to accept monthly payments from installment plan homeowners in order to gradually repay the money it owes to those who paid in a lump sum. *692 Ante, at 683, 686. But this approach was never dreamt of by the City itself. See Brief for Respondents 18 (setting out City’s “three basic [transition] options,” none of which involved the Court’s gradual refund scheme).
The Court suggests that the City’s administrative convenience argument is one with which the law is comfortable. The Court compares the City’s decision to forgive the installment balances to the sort of parking ticket and mortgage payment amnesty programs that currently abound. Ante, at 683. This analogy is misplaced: Amnesty programs are designed to entice those who are unlikely ever to pay their debts to come forward and pay at least a portion of what they owe. It is not administrative convenience alone that justifies such schemes. In a sense, these schemes help remedy payment inequities by prompting those who would pay nothing to pay at least some of their fair share. The same cannot be said of the City’s system.
The Court is willing to concede that “administrative considerations could not justify ... an unfair system” in which “a city arbitrarily allocate^] taxes among a few citizens while forgiving many similarly situated citizens on the ground that it is cheaper and easier to collect taxes from a few people than from many.” Ante, at 685-686. Cold comfort, that. If the quoted language does not accurately describe this case, I am not sure what it would reach.
The Court wisely does not embrace the City’s alternative argument that the unequal tax burden is justified because “it would have been fiscally challenging to issue refunds.” Brief for Respondents 35. “Fiscally challenging” gives euphemism a bad name. The City’s claim that it has already spent petitioners’ money is hardly worth a response, and the City recognizes as much when it admits it could provide refunds to- petitioners by “arranging] for payments from non-Barrett Law sources.” Id., at 36. One cannot evade returning money to its rightful owner by the simple expedient of spending it. The “fiscal challenge” justification seems particularly inappropriate in this case, as the City — with an *693 annual budget of approximately $900 million — admits that the cost of refunding all of petitioners’ money would be approximately $300,000. Adopted 2012 Budget for the Consolidated City of Indianapolis, Marion County (Oct. 17, 2011), p. 7; Tr. of Oral Arg. 17, 58.
■ Equally unconvincing is the Court’s attempt to distinguish Allegheny Pittsburgh. The Court claims that case was different because it involved “a clear state-law requirement clearly and dramatically violated.” Ante, at 687. Nothing less is at stake here. Indiana law requires that the costs of sewer projects be “apportioned equally among all abutting lands.” Ind. Code § 36-9-39-15(b)(3). The City has instead apportioned the costs of the Brisbane/Manning Project such that petitioners paid between 10 and 30 times as much as their neighbors. Worse still, it has done so in order to avoid administrative hassle and save a bit of money. To paraphrase A Man for All Seasons: “It profits a city nothing to give up treating its citizens equally for the whole world . . . but for $300,000?” See R. Bolt, A Man for All Seasons, act II, p. 158 (1st Vintage Int’l ed. 1990).
Our precedents do not ask for much from government in this area — only “rough equality in tax treatment.” Allegheny Pittsburgh, 488 U. S., at 343. The Court reminds us that Allegheny Pittsburgh is a “rare case.” Ante, at 687. It is and should be; we give great leeway to taxing authorities in this area, for good and sufficient reasons. But every generation or so a case comes along when this Court needs to say enough is enough, if the Equal Protection Clause is to retain any force in this context. Allegheny Pittsburgh was such a case; so is this one. Indiana law promised neighboring homeowners that they would be treated equally when it came to paying for sewer hookups. The City then ended up charging some homeowners 30 times what it charged their neighbors for the same hookups. The equal protection violation is plain. I would accordingly reverse the decision of the Indiana Supreme Court, and respectfully dissent from the Court’s decision to do otherwise.