AFSCME COUNCIL 25 v STATE EMPLOYEES' RETIREMENT SYSTEM

MICHIGAN STATE EMPLOYEES ASSOCIATION v STATE
EMPLOYEES' RETIREMENT SYSTEM

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 517M v
STATE EMPLOYEES' RETIREMENT SYSTEM

McNEILL v PUBLIC SCHOOL EMPLOYEES' RETIREMENT BOARD

Docket Nos. 302959, 302960, 302961, and 302962. Submitted July 12, 2011, at Lansing. Decided August 25, 2011, at 9:00 a.m. Leave to appeal denied, 490 Mich 935.

AFSCME Council 25, the Michigan State Employees Association, Service Employees International Union, Local 517M and Local 526M, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and its Local 6000, and various members of the plaintiff unions brought four separate actions in the Court of Claims against the State Employees' Retirement System and its board, the Public Employee Retirement Health Care Funding Trust, the Department of Technology Management and Budget and its director, the director of the Office of Retirement Services, the state of Michigan, the Public School Employees' Retirement Board, and the Treasurer of the state of Michigan, alleging that 2010 PA 185, MCL 38.35, the statute requiring a three percent employee compensation contribution to finance the Public Employee Retirement Health Care Funding Act, 2010 PA 77, MCL 38.2731 to 38.2747, is unconstitutional and seeking a declaratory judgment to that effect. The actions were consolidated in the Court of Claims. The Court of Claims, William E. Collette, J., granted plaintiffs' motion for summary disposition on the basis that MCL 38.35 violated Const 1963, art 11, § 5 and denied defendants' motion for summary disposition. Defendants brought four separate appeals. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The Court of Claims had jurisdiction to hear the dispute because plaintiffs alleged a current confiscation of their compensation without adherence to the provisions of Const 1963, art 11, § 5 and in violation of the relevant collective-bargaining agree-

ment and plaintiffs' contractual rights. Plaintiffs did not base their action on a hypothetical situation.

2. The Civil Service Commission has absolute power in its field. The commission's power and authority is derived from the constitution, therefore, its valid exercise of that power cannot be taken away by the Legislature. The commission regulates the terms and conditions of employment of classified civil service employees and has plenary and absolute authority in that respect. Although the commission had plenary authority over the rates of compensation, a system of checks and balances with the Legislature is established in Const 1963, art 11, § 5 whereby an increase in the rate of compensation authorized by the commission may be rejected or reduced by the Legislature by a ⅔ vote of the members elected to and serving in each house provided the vote occurs within 60 calendar days of the transmitted increase. By enacting 2010 PA 185 and adding the current version of MCL 38.35, the Legislature acted to reduce the compensation of classified civil servants without an accompanying agreement with the unions or the Civil Service Commission. Pursuant to Const 1963, art 3, § 2, and art 11, § 5, the Legislature did not have the authority to eliminate the wage increase agreed to in the collective bargaining agreement by enacting MCL 38.35. The Legislature failed to successfully invoke the process for overriding the commission set forth in the constitution.

3. The fact that prior versions of MCL 38.35 were not the subject of a constitutional challenge does not render them constitutional.

4. MCL 38.35 contravenes the provisions of the constitution and is unconstitutional and void.

Affirmed.

CONSTITUTIONAL LAW — CIVIL SERVICE COMMISSION — PUBLIC EMPLOYEES — HEALTH-CARE FUNDING.

The statute enacted by 2010 PA 185 to require a three percent employee compensation contribution to finance the Public Employee Retirement Health Care Funding Act, MCL 38.2731 *et seq.*, violates the grant of authority to the Civil Service Commission to regulate the rates of compensation of classified civil service employees in Const 1963, art 11, § 5 (MCL 38.35).

*Miller Cohen, P.L.C.* (by *Bruce A. Miller* and *Keith D. Flynn*), for AFSCME Council 25, Sylvester Austin, Mark Smith, David Baker, Myrtel Brown, and Lenore Davis.

*Fraser Trebilcock Davis & Dunlap, P.C.* (by *Brandon W. Zuk*), for the Michigan State Employees Association, Kenneth Moore, Tim Schutt, Donna Spencer, and Russell Waters.

*Sachs Waldman* (by *Mary Ellen Gurewitz* and *Marshall Widick*) for Service Employees International Union, Locals 517M and 526M.

*William A. Wertheimer* for Anthony McNeill, Rachael Siemen, Rick Hankinson, and Ray Holman.

*William A. Wertheimer, Michael B. Nicholson,* and *Ava R. Barbour* for International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and its Local 6000.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Council, and *Frank J. Monticello, Thomas Quasarano*, and *Larry F. Brya*, Assistant Attorneys General, for the State Employees' Retirement System and others.

Amicus Curiae:

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Michael J. Hodge* and *Scott R. Eldridge*), for the Civil Service Commission.

Before: BECKERING, P.J., and FORT HOOD and STEPHENS, JJ.

FORT HOOD, J. Defendants, the entities and individuals charged with the administration, collection, and distribution of the State Employees' Retirement System,

appeal as of right the Court of Claims' decision holding that MCL 38.35, the statute requiring a three percent employee compensation contribution to finance the Public Employee Retirement Health Care Funding Act, 2010 PA 77, MCL 38.2731 to 38.2747, is unconstitutional. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiffs[1] addressed wage provisions during collective-bargaining negotiations with the state. Ultimately, the parties agreed to a collective-bargaining agreement (CBA) that provided that hourly wages would be frozen for the fiscal year 2008-2009, increased by one percent for fiscal year 2009-2010, and increased by three percent for fiscal year 2010-2011. The CBA was approved by the Civil Service Commission (CSC or the commission) and transmitted to then Governor Jennifer Granholm for incorporation into the state budget.

An attempt to reject the three percent wage increase included in the 2010-2011 budget failed in the Legislature. On February 23, 2010, House Concurrent Resolution (HCR) 42 was introduced that proposed rejection of an increase in rates of compensation as recommended by the CSC. There is no indication that the resolution was voted on by house members of the Legislature. On March 3, 2010, an attempt to reject the three percent wage increase was made in the Senate when Senate Concurrent Resolution (SCR) 35 was introduced. This SCR contained an acknowledgment of the constitutional authority of the CSC and the requirement that a vote of two-thirds of the members serving in each house was required to reject the commission's approval of the

---

[1] Plaintiffs are unions that are parties to a collective-bargaining agreement with the state and individual members of the unions.

wage increase. Despite the introduction of SCR 35 and numerous attempts to pass the resolution throughout March 2010, it did not garner a sufficient number of votes for passage. On March 24, 2010, HCR 48 was introduced. This HCR also contained an acknowledgment of the constitutional authority of the CSC and the requirement that a two-thirds vote of the members serving in each house was required to reject the increase. There is no indication that action was taken on this resolution.

Unable to obtain the two-thirds vote in each house to override the three percent compensation increase negotiated in the CBA and approved by the CSC, the Legislature enacted 2010 PA 185, MCL 38.35, and 2010 PA 77, MCL 38.2731 *et seq.* MCL 38.35 required a mandatory three percent contribution from the compensation of active employee members from November 1, 2010, through September 30, 2013, into the Public Employee Retirement Health Care Funding Act, MCL 38.2731 *et seq.* Plaintiffs filed suit in the Court of Claims to challenge the reduction from compensation by the enactment of MCL 38.35.[2] Plaintiffs alleged that the reduction in compensation was in violation of both the Michigan Constitution and the United States Constitution and of contractual rights. Defendants countered that the regulation of the retirement system was within the province of the Legislature and that the Court of Claims lacked jurisdiction because the availability of the benefits at a later date presented a hypothetical question. The Court of Claims held that MCL 38.35 violated art 11, § 5 of the Michigan Consti-

---

[2] There were four separate actions filed in the Court of Claims, and the actions were consolidated in the lower court, although the order stated that each case would keep its separate identity and the parties in one action would not become parties in the other actions. The Court of Appeals consolidated the appeals.

tution, rejected the jurisdictional challenge, and did not address the remaining claims. Defendants appeal as of right.

## II. JURISDICTION

A challenge to the jurisdiction of the Court of Claims presents a statutory question that is reviewed de novo as a question of law. *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 767; 664 NW2d 185 (2003). The Court of Claims has exclusive jurisdiction to hear and determine "all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MCL 600.6419(1)(a); *Parkwood*, 468 Mich at 767. The Court of Claims also has concurrent jurisdiction over "any demand for equitable relief and any demand for a declaratory judgment when ancillary to a claim filed" pursuant to MCL 600.6419. MCL 600.6419a. The determination whether the Court of Claims possesses jurisdiction is governed by the actual nature of the claim, not how the parties phrase the request for relief or the characterization of the nature of the relief. *Parkwood*, 468 Mich at 770. "[T]he Court of Claims has exclusive jurisdiction over complaints based on contract or tort that seek solely declaratory relief against the state or any state agency." *Parkwood*, 468 Mich at 775.

In the present case, defendants contend that the Court of Claims lacked jurisdiction to issue a declaratory judgment because the issue regarding the availability of benefits for current employees upon their retirement presents a *hypothetical* injury premised on a future contingent event. The power of state courts to pass upon the constitutionality of state statutes arises only when interested litigants require the use of judicial

authority for protection against actual interference, not hypothetical threats. *Golden v Zwickler*, 394 US 103, 110; 89 S Ct 956; 22 L Ed 2d 113 (1969). Here, although defendants' statement of the issue alleges a jurisdictional challenge, in fact, defendants effectively assert that there is no justiciable controversy because the availability of health benefits upon retirement for current employees is contingent on a future event. We disagree.

A condition precedent to invoke declaratory relief is the requirement that an actual controversy exist. *Detroit v Michigan*, 262 Mich App 542, 550; 686 NW2d 514 (2004). An actual controversy is present when a declaratory judgment is necessary to direct a plaintiff's future conduct in order to preserve his or her legal rights. *Shavers v Attorney General*, 402 Mich 554, 588; 267 NW2d 72 (1978). Although the actual-controversy requirement prevents a court from ruling on hypothetical questions, a court is not precluded from addressing issues before actual injuries or losses have developed. *Id.* at 589. Furthermore, "declaratory relief is designed to resolve questions . . . before the parties change their positions or expend money futilely." *Detroit*, 262 Mich App at 551.

Although defendants characterize plaintiffs' claims as seeking relief from a hypothetical event, plaintiffs allege a current confiscation of their compensation without adherence to the provisions of Const 1963, art 11, § 5 and in violation of their CBA and contractual rights. Specifically, irrespective of the future availability of retiree health benefits to current employees, plaintiffs challenge the reduction in wages from November 1, 2010, through September 30, 2013. In light of the present reduction in compensation, defendants' jurisdictional challenge claiming that plaintiffs are raising a

hypothetical scenario regarding events that may occur upon their retirement fails.

### III. STANDARD OF REVIEW

The trial court's decision regarding a motion for summary disposition is reviewed de novo with the evidence examined in the light most favorable to the nonmoving party. *In re Egbert R Smith Trust*, 480 Mich 19, 23-24; 745 NW2d 754 (2008). Issues involving statutory interpretation present questions of law that are reviewed de novo. *Klooster v Charlevoix*, 488 Mich 289, 295-296; 795 NW2d 578 (2011). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76; 780 NW2d 753 (2010). To determine the legislative intent, the court must first examine the statute's plain language. *Klooster*, 488 Mich at 296. If the language of the statute is clear and unambiguous, it is presumed that the Legislature intended the meaning plainly expressed in the statute. *Briggs*, 485 Mich at 76.

Cases involving questions of constitutional interpretation are reviewed de novo. *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83, 89; 803 NW2d 674 (2011). When interpreting a constitutional provision, the primary goal is to determine the initial meaning of the provision to the ratifiers, the people, at the time of ratification. *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 67; 748 NW2d 524 (2008). "[T]he primary objective of constitutional interpretation, not dissimilar to any other exercise in judicial interpretation, is to faithfully give meaning to the intent of those who enacted the law." *Id*. To effectuate this intent, the appellate courts apply the plain meaning of the terms used in the constitution. *Toll Northville Ltd v Northville Twp*, 480 Mich 6, 11; 743 NW2d 902 (2008). When technical terms are employed,

the meaning understood by those sophisticated in the law at the time of enactment will be given unless it is clear that some other meaning was intended. *Id*. To clarify the meaning of the constitutional provision, the court may examine the circumstances surrounding the adoption of the provision and the purpose sought to be achieved. *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). An interpretation resulting in a holding that the provision is constitutionally valid is preferred to one that finds the provision constitutionally invalid, and a construction that renders a clause inoperative should be rejected. *Id*. at 406. Constitutional convention debates are relevant, albeit not controlling. *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW2d 452 (2003). Every provision in our constitution must be interpreted in light of the document as a whole, and "no provision should be construed to nullify or impair another." *Id*. "Statutes are presumed constitutional unless the unconstitutionality is clearly apparent." *Toll Northville Ltd*, 480 Mich at 11. The court's power to declare a law unconstitutional is exercised with extreme caution and is not exercised where serious doubt exists regarding the conflict. *Dep't of Transp v Tomkins*, 481 Mich 184, 191; 749 NW2d 716 (2008).

### IV. THE CREATION OF THE CIVIL SERVICE COMMISSION

In October 1935, the Civil Service Study Commission, appointed by Governor Frank D. Fitzgerald, initiated a year-long study of state personnel practices to determine " 'the most important evils from which the state [was] suffering.' " *Council No 11, AFSCME v Civil Serv Comm*, 408 Mich 385, 397; 292 NW2d 442 (1980) (citation omitted). The result was a condemnation of the longstanding "spoils system" or "patronage system" where government jobs were filled with loyal party

workers who were counted on, not to perform the work of the state, but rather to perform party or candidate work during election season. *Id.* at 397 n 10. As a result of the spoils system, state office buildings were nearly empty during political conventions. *Id.* Consequently, the regular work of the state was interrupted, and services and funds were at the disposal of political parties. *Id.* To remedy the spoils system, it was recommended that legislation establish a state civil service system. *Id.* at 397.

In response to the commission's findings and recommendations and heightened public interest, the Legislature created 1937 PA 346, which was designed to eliminate the spoils system and prohibit participation in political activities during the hours of employment. *Council No 11*, 408 Mich at 398. In its next regular session, the Legislature adopted a group of bills designed to destroy the recently established Civil Service Commission. It created legislation that sharply curtailed the state classified civil service, diminished the authority of the director of the commission by repealing a provision vesting executive and administrative functions in the director, made the director an appointee of the commission to serve at its pleasure, reduced the CSC's appropriation to require serious staff reductions and limited services, and provided increased employment preferences for veterans and former state employees. *Id.* at 399. The Legislature succeeded in "badly crippling" the newly created Civil Service Commission. *Id.* Specifically, in a two-year period, the number of "exempt" civil service positions climbed. The percentage of state employees serving in classified positions fell from 90.7 percent in January 1939 to 51.1 percent in March 1940. *Id.* at 400. Additionally, only the lowest-paying jobs were retained as classified positions. *Id.* In 1940, apparently unsatisfied with the political maneuvering and the dismantling of the Civil Service

Commission, the people of Michigan "adopted a constitutional amendment establishing a constitutional state civil service system, superseding the 1939 legislation." *Id.* at 401.

Before changes to the 1963 Constitution, the Civil Service Commission had "absolute authority to set compensation at any time during the course of a fiscal year without legislative oversight." *Mich Ass'n of Governmental Employees v Civil Serv Comm*, 125 Mich App 180, 187; 336 NW2d 463 (1983). However, at the 1961 Constitutional Convention, delegates proposed a change to allow legislative oversight, commenting as follows:

> "[T]his amendment would . . . only affect[] increases in rates of compensation for classified personnel. Presently, the civil service commission has the absolute power to fix rates of compensation in any amount and at any time it desires, free from legislative control or accountability.

> "This amendment would require several things. First of all, it would require that any proposed increases made by the civil service commission be submitted with the governor's budget. Now, this has been the practice for the past 2 or 3 years. However, we are dealing primarily here in what I would consider statutory language. There is nothing in the present constitution to require the commission to continue the practice that they followed in the past few years, or to prevent them from reverting to the practice of declaring a pay raise at any time. This would make it crystal clear that any proposed increases in rates of compensation must be submitted with the governor's budget.

> "Then these rates or increased rates would take effect only at the beginning of the next fiscal year. In other words, if a proposed increase were submitted with the governor's budget in January, it would not take effect until July 1 of that year. Also, the rates would take effect, upon the failure of the legislature, within 60 days after submission of this

recommendation, to either reject, modify or reduce the amount recommended by the commission.

"The amendment gives the legislature this power to reject, modify or reduce increases in rates of compensation where there is a 2/3 vote of the members elected, if you will, in each house. In other words, in order to defeat a recommendation of the civil service commission as to pay raises, 2/3 of the senate would have to reject it, 2/3 of the house would have to reject, modify or reduce it.

"Additionally, the amendment would prohibit the legislature from reducing rates of compensation in effect at the time of the submission of the commission's recommendations to the legislature. In other words, the legislature would not be given the authority, even with a 2/3 vote, of going below those rates of compensation which are in effect at the time of a proposed increase.

"Now, it is sincerely believed that this proposed amendment is not a drastic one; it is not a radical one, but it is offered for the following reasons:

"It is believed that no governmental unit should be free from the time tested and proven checks and balances inherent in our constitutional form of government. Since the civil service commissioners are appointed for 8 year terms, they truly are not accountable to the governor, particularly a governor of short duration. Although the legislature presently has the power to fix the total appropriation within a given agency, it has no method of controlling abuses in a salary classification which could occur in the future. In recognition of the fact that commissioners are but mere human beings and, as such, subject to error, it is felt that they should be accountable to the people for their actions, and this . . . is accomplished through giving the legislature a veto power. Now, for those who favor retention of this power by the civil service commission—in other words, the right to fix compensation—it should be pointed out that civil service retains the initiating power to raise rates under the proposed language. Also, as a practical proposition, the requirement of a 2/3 vote of both houses to reject, modify or reduce the commission's recommendation means that the veto power

> could not be exercised readily, and would undoubtedly be exercised only in the event of a real abuse by the commission." 1 Record of the Constitutional Convention of 1961, p 652. [*Mich Ass'n of Governmental Employees*, 125 Mich App at 187-189.]

Consequently, although the prior version of the constitutional article creating the Civil Service Commission contained no provision regarding legislative oversight, Const 1908, art 6, § 22 (adopted in 1940), the amendment expressly allowed legislative action over CSC determinations by a two-thirds vote of the members serving in each house. Const 1963, art 11, § 5.

Currently, the Civil Service Commission is authorized by Const 1963, art 11, § 5, which provides, in relevant part:

> The classified state civil service shall consist of all positions in the state service except those filled by popular election, heads of principal departments, members of boards and commissions, the principal executive officer of boards and commissions heading principal departments, employees of courts of record, employees of the [L]egislature, employees of the state institutions of higher education, all persons in the armed forces of the state, eight exempt positions in the office of the governor, and within each principal department, when requested by the department head, two other exempt positions, one of which shall be policy-making. The civil service commission may exempt three additional positions of a policy-making nature within each principal department.

> The civil service commission shall be non-salaried and shall consist of four persons, not more than two of whom shall be members of the same political party, appointed by the governor for terms of eight years, no two of which shall expire in the same year.

> The administration of the commission's powers shall be vested in a state personnel director who shall be a member of

the classified service and who shall be responsible to and selected by the commission after open competitive examination.

The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.

\* \* \*

No person shall be appointed to or promoted in the classified service who has not been certified by the commission as qualified for such appointment or promotion. No appointments, promotions, demotions or removals in the classified service shall be made for religious, racial or partisan considerations.

Increases in rates of compensation authorized by the commission may be effective only at the start of a fiscal year and shall require prior notice to the governor, who shall transmit such increases to the [L]egislature as part of his budget. The [L]egislature may, by a majority vote of the members elected to and serving in each house, waive the notice and permit increases in rates of compensation to be effective at a time other than the start of a fiscal year. Within 60 calendar days following such transmission, the [L]egislature may, by a two-thirds vote of the members elected to and serving in each house, reject or reduce increases in rates of compensation authorized by the commission. Any reduction ordered by the [L]egislature shall apply uniformly to all classes of employees affected by the increases and shall not adjust pay differentials already established by the civil service commission. The [L]egislature may not reduce rates of compensation below those in

effect at the time of the transmission of increases authorized by the commission.

\* \* \*

The civil service commission shall recommend to the governor and to the [L]egislature rates of compensation for all appointed positions within the executive department not a part of the classified service.

The Civil Service Commission is an administrative agency established by the Michigan Constitution. Const 1963, art 11, § 5; *Viculin v Dep't of Civil Serv*, 386 Mich 375, 385; 192 NW2d 449 (1971); *Womack-Scott v Dep't of Corrections*, 246 Mich App 70, 79; 630 NW2d 650 (2001). Pursuant to the constitutional amendment, the Civil Service Commission is vested with plenary powers in its "sphere of authority." *Plec v Liquor Control Comm*, 322 Mich 691, 694; 34 NW2d 524 (1948). That is, the Civil Service Commission has absolute power in its field. *Hanlon v Civil Serv Comm*, 253 Mich App 710, 718; 660 NW2d 74 (2002). "Because the CSC's power and authority is derived from the constitution, its valid exercise of that power cannot be taken away by the Legislature." *Id.* at 717. "The CSC regulates the terms and conditions of employment in the classified service and has plenary and absolute authority in that respect." *Womack-Scott*, 246 Mich App at 79. The Legislature and the appellate courts have no right to amend or change a provision contained in the state constitution. *Pillon v Attorney General*, 345 Mich 536, 547; 77 NW2d 257 (1956). Consequently, when a statute contravenes the provisions of the state constitution it is unconstitutional and void. *Id.*

V. THE CIVIL SERVICE COMMISSION'S EXERCISE OF ITS AUTHORITY

The extent of the Civil Service Commission's authority has been addressed by the courts of this state. In

*Council No 11*, 408 Mich at 392, one of the individual plaintiffs, an employee in the state classified civil service, filed nominating petitions to become a candidate for political office. As a result of the filing, he was discharged for violating the commission rule ordering a flat ban on off-duty as well as on-duty political activity by all state classified civil service employees. *Id.* at 392-393. However, the Legislature "is empowered to enact laws to promote and regulate political campaigns and candidacies." *Id.* at 395. Consequently, the Legislature took the unusual step of enacting 1976 PA 169, which gave employees in the state's classified civil service the "right to engage in partisan political activity, serve as convention delegates and run for elective office while on mandatory leave of absence." *Id.* at 395. The Civil Service Commission asserted that the statute permitting certain types of political activity was unconstitutional because it conflicted with the commission's rulemaking authority and the commission's exclusive jurisdiction over civil service employees as derived from Const 1963, art 11, § 5. *Id.* at 395-396.

The Supreme Court rejected the commission's challenge to the constitutionality of 1976 PA 169, and allowed off-duty political activity by civil service employees. The Court held that the plain language of the provision creating the Civil Service Commission contained no such language forbidding off-duty political activity that did not interfere with job performance. *Id.* at 405-407. The Court held that the Civil Service Commission's sphere of authority did not extend to off-duty behavior unrelated to job performance. *Id.* at 408-409. Therefore, a valid exercise of legislative authority applicable to state classified civil service employees was permissible provided that it did not interfere with the constitutional authority of the Civil Service Commission. *Id.* at 409. Consequently, legislation must

be examined within the context of the authority delegated to the CSC in the Michigan Constitution.

The Michigan Constitution empowers the Civil Service Commission to exercise authority over the compensation of classified civil service employees. In *Crider v Michigan*, 110 Mich App 702, 707; 313 NW2d 367 (1981), the state initiated a voluntary-layoff program to address severe financial circumstances. When the voluntary-layoff program failed to sufficiently reduce payroll costs, a task force formed by the Governor recommended six one-day layoffs for certain state employees that would not result in the reduction of their hourly pay rate or fringe benefits. *Id.* To facilitate this proposal, one of the defendants, the Civil Service Commission, temporarily modified its rules regarding notice to allow for emergency situations that required immediate action. *Id.* at 707-709. The plaintiffs challenged the layoffs, asserting that the layoffs violated Const 1963, art 11, § 5, because the layoffs impermissibly reduced the salary of state officers. *Crider*, 110 Mich App at 722. This Court disagreed, holding:

> Defendants concede that the Governor did not receive the approval of the appropriating committees of the House and the Senate for the salary reductions apparent in the layoff program. They further admit that the Governor does not have the authority to either personally order the layoff of state classified employees or to reduce appropriations for their salaries. Defendants contend, however, that the CSC does have authority to order or request departments to lay off classified state employees under Const 1963, art 11, § 5.

> This latter constitutional provision confers upon the CSC plenary power to "fix rates of compensation for all classes of positions * * * and regulate all conditions of employment in the classified service". The CSC's constitutional authority to regulate the conditions of employment in classified civil service is independent from and not limited by the provisions of Const 1963, art 5, § 20. Accord-

ingly, if the CSC's implementation of the layoff plan was permissible under art 11, § 5, it is not necessary for us to consider the effect of the failure of the Governor to comply with the conditions of art 5, § 20 of the Michigan Constitution. This follows by virtue of the fact that it is the Civil Service Commission, and not the Legislature, that is given "supreme power" over civil service employees under art 11, § 5. *Welfare Employees Union v Civil Service Comm*, 28 Mich App 343; 184 NW2d 247 (1970).

Our review of the record convinces us that the one-day layoff program instituted by the CSC was within the authority delegated to that agency under art 11, § 5. The effect of the layoff program is to reduce the actual number of hours worked in certain pay periods by classified state employees. The number of hours in a pay period is a condition of employment that is subject to the constitutional supremacy of the CSC. *Welfare Employees Union v Civil Service Comm, supra.* Nothing in the Michigan Constitution or in the rules and regulations of the CSC requires classified state employees to work any particular number of hours in a pay period or requires that they receive compensation for a specified number of hours during any fiscal year.

\* \* \*

Because Const 1963, art 11, § 5 vests in the CSC exclusive authority to establish the conditions of employment for public employees and because neither plaintiffs nor the amicus curiae have cited any other constitutional provisions that the CSC may have violated in reducing the number of hours worked by plaintiffs, there is no merit to the contention that the one-day layoff program violates the constitution of this state. [*Crider*, 110 Mich App at 723-725.]

Additionally, in *Mich Ass'n of Governmental Employees*, 125 Mich App at 183-185, the commission ratified two collective-bargaining agreements that included a five-percent wage increase and vision-care benefits for

certain employees. The agreements for the wage increase and the vision-care benefits were transmitted to the Legislature. The Legislature passed a resolution rejecting the wage increase, but the resolution was contingent on the employees' unions' agreeing to modify the collective-bargaining agreements to eliminate the provisions for the wage increase. When the Office of the State Employer was unable to negotiate the concessions with the unions, the resolution became null and void. Consequently, the State Employer, at the behest of the Governor, asked the CSC to rescind the five-percent wage increase. The commission acted to rescind the wage increase and vision benefits applicable to two-thirds of the state classified civil service employees. *Id.* at 185.

The plaintiffs challenged the CSC's authority to rescind the authorized wage increase after it had been considered by the Legislature. *Id.* at 186. On appeal, the commission's rejection of the wage increase and vision benefits was upheld. "It is this Court's opinion that the commission had the authority to rescind and defer the proposed increase even after it was considered by the Legislature." *Id.* at 187. Const 1963, art 11, § 5, ¶ 7 allows the Legislature to have narrowly drawn veto power over increases in state wages. *Mich Ass'n of Governmental Employees*, 125 Mich App at 189. This provision of the Michigan Constitution does not foreclose "later action by the commission to rescind an authorized increase which has not been vetoed by the Legislature." *Id.* The Legislature's inability to veto an increase by a two-thirds vote of the members serving in each house does not mandate that salaries be maintained at that level in light of the authority over compensation that is granted to the Commission. *Id.* Consequently, the CSC exercised its sphere of authority to reduce compensation to classified civil service em-

ployees when the Legislature failed to act or was unable to garner sufficient support of its members to act within the parameters for adjustments to compensation in accordance with the Michigan Constitution.

### VI. MCL 38.35

In 1943, the Legislature established a savings fund for employees that required deductions for contribution to the fund. The statute, MCL 38.35, provided, in relevant part:

> Beginning July 1, 1943, each state employe who is a member of the retirement system shall contribute 5 per centum of that part of his compensation earnable, not in excess of $3,600.00 per annum, to the employes' savings fund; compensation earnable, as herein used, shall mean salary or wages received during a payroll period for personal services plus such allowance for maintenance as may be recognized by the maintenance compensation schedules of the civil service commission. [1943 PA 240.]

The statutory provision following MCL 38.35 in 1943 PA 240, MCL 38.36, expressly stated that the deduction was agreed to between the Legislature and the members. MCL 38.36 provided:

> Members agree to deductions. The deductions from the compensation of members, provided for in section 37 [sic] of this act, shall be made notwithstanding that the minimum compensation provided for by law for any member shall be reduced thereby. Every member shall be deemed to consent and agree to the deductions made and provided for in this act and shall receipt in full for his salary or compensation, and payment less said deductions shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payment, except as to benefits provided for under this act. [1943 PA 240.]

MCL 38.35 was amended in 1955 (1955 PA 237) to require, in relevant part, as follows:

> Each member shall, to the date the members of the retirement system become covered under the federal social security old-age and survivors' insurance program on account of their state employment, contribute 5% of the first $4,800.00 of his annual compensation to the employees' savings fund. From and after the said date upon which members of the retirement system become covered under the said old-age and survivors' insurance program, each member shall contribute to the employees' savings fund 3% of the first $4,200.00 of his annual compensation plus 5% of his annual compensation in excess of $4,200.00.

MCL 38.36 was modified by 1955 PA 237 to provide that the payroll deduction to the employees' savings fund was presumably consented to by the members:

> The deductions from the compensation of members, provided for in section 35 of this act, shall be made notwithstanding that the minimum compensation provided for by law for any member shall be reduced thereby. Every member shall be deemed to consent and agree to the deductions made and provided for in this act, and payment less said deductions shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payment, except as to benefits provided for under this act. [1955 PA 237.]

MCL 38.35 and MCL 38.36 were repealed by 1974 PA 216. However, effective September 30, 2010, the Legislature enacted 2010 PA 185, which added a new MCL 38.35, the statute at issue in this case, to implement member and participant contribution to health-care-financing accounts, stating in subsection (1) of § 35:

> Except as otherwise provided in this section, beginning with the first pay date after November 1, 2010 and ending September 30, 2013, each member and each qualified

> participant shall contribute an amount equal to 3.0% of the member's or qualified participant's compensation to the appropriate funding account established under the public employee retirement health care funding act, 2010 PA 77, MCL 38.2731 to 38.2747. The member and qualified participant contributions shall be deducted by the employer and remitted as employer contributions to the funding account in a manner that the state budget office and the retirement system shall determine. The state budget office and the retirement system shall determine a method of deducting the contributions provided for in this section from the compensation of each member and qualified participant for each payroll and each payroll period. [MCL 38.35(1).]

Notably absent from this legislation is MCL 38.36, now repealed, the companion provision to prior versions of MCL 38.35 that expressly stated that the deduction was the subject of an agreement among members to consent to the deduction and to preclude litigation premised on the deduction.

With regard to the present version of MCL 38.35, plaintiffs contend that the enactment of 2010 PA 185 violates Const 1963, art 11, § 5. We agree and hold that MCL 38.35 contravenes the provisions of Const 1963, art 11, § 5 and, therefore, it is unconstitutional and void. *Pillon*, 345 Mich at 547.

A review of the record reveals that plaintiffs, unions and their members, negotiated a CBA wage provision that culminated in a three percent wage increase for fiscal year 2010-2011. The commission's sphere of authority, *Plec*, 322 Mich at 694, includes determinations of rates of compensation for all positions in the classified service:

> The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal

services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service. [Const 1963, art 11, § 5, ¶ 4.]

Although the commission has plenary authority over the rates of compensation, a system of checks and balances was established with the Legislature in the Michigan Constitution of 1963. *Mich Ass'n of Governmental Employees*, 125 Mich App at 187-189. Specifically, an increase in the rate of compensation authorized by the commission may be rejected or reduced by the Legislature "by a two-thirds vote of the members elected to and serving in each house" provided the vote occurs within 60 calendar days of the transmitted increase. Const 1963, art 11, § 5, ¶ 7; *Mich Ass'n of Governmental Employees*, 125 Mich App at 187. "The [L]egislature may not reduce rates of compensation below those in effect at the time of the transmission of increases authorized by the commission." Const 1963, art 11, § 5, ¶ 7. The Civil Service Commission has the sole authority to fix rates of compensation. Const 1963, art 11, § 5, ¶ 4. The term "compensation" is defined as "something given or received for services, debt, loss, injury, etc." *Random House Webster's College Dictionary* (2001), p 271. By enacting 2010 PA 185 and adding the current version of MCL 38.35, the Legislature acted to reduce the compensation of classified civil servants by three percent without an accompanying agreement with the unions or the CSC. The sole authority to fix rates of compensation of classified civil servants is vested with the CSC. *Womack-Scott*, 246 Mich App at 79.

When interpreting a constitutional provision, the primary objective is to determine the initial meaning of the provision to the ratifiers, or the people, at the time of ratification. *Nat'l Pride*, 481 Mich at 67. To effectuate this intent, the plain meaning of the terms used in the constitution are examined and applied. *Toll Northville Ltd*, 480 Mich at 11. To clarify the meaning of this provision, we may examine the circumstances surrounding its adoption and its purpose. *Traverse City Sch Dist*, 384 Mich at 405. Every provision of the constitution must be interpreted in light of the document as a whole, and no provision should be construed to nullify or impair another. *Lapeer Co Clerk*, 469 Mich at 156.

The Separation of Powers Clause of the Michigan Constitution states:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution. [Const 1963, art 3, § 2.]

"The Constitution of the State of Michigan is not a grant of power to the [L]egislature, but is a limitation upon its powers." *In re Brewster Street Housing Site*, 291 Mich 313, 333; 289 NW 493 (1939). The plain language of Const 1963, art 11, § 5, ¶ 7 shows the intent that the rate of compensation is established by the CSC. Although the Legislature may exercise oversight over the CSC, it must act within 60 days of the commission's action and must do so by a two-thirds vote of the members serving in each house. Const 1963, art 11, § 5, ¶ 7.

In the present case, the Legislature attempted to eliminate the three percent wage increase for the fiscal year 2010-2011 but did not succeed. However, the

Legislature faced a budget deficit and determined that it would balance the budget by reducing the "compensation" of state employees, as defendants readily admitted in their brief on appeal:

> In the fall of 2010, the Legislature was faced with the acute problem of balancing the State's budget for the fiscal year beginning October 1, 2010. As a result the Legislature enacted MCL 38.35, which requires members and qualified participants in MSERS to contribute 3% of their compensation to the Trust created by MCL 38.2731, *et seq* in return for receiving health care for retirees, former qualified recipients, and their respective dependants. It was anticipated that MCL 38.35 would generate about $75 million annually to help balance the budget, though the total cost of health care for recipients for the year beginning October 1, 2010 will be approximately $500 million. [Defendants' Brief on Appeal, p 6.]

Pursuant to Const 1963, art 3, § 2 and Const 1963, art 11, § 5 the Legislature did not have the authority to act to eliminate the three percent wage rate increase by enacting MCL 38.35 to remedy a budget deficit. The process for overriding the commission is expressly set forth in the Michigan Constitution, and when the Legislature failed to successfully invoke that process, it enacted MCL 38.35 to exercise authority over compensation, which is within the sphere of authority of the commission. *Plec*, 322 Mich at 694.

Moreover, caselaw reflects a record of cooperation between the branches of government to abide by the separation of powers as set forth in the Michigan Constitution. Specifically, when a voluntary layoff program failed to achieve the costs savings necessary to correct an increasing budget deficit, the commission, at the request of another branch of government, temporarily suspended its rules to allow for a program of six one-day layoffs. *Crider*, 110 Mich App at 723-725. This

Court upheld the commission's actions, determining that the commission had the exclusive authority to establish the conditions of employment for public employees. *Id.* at 725. Additionally, in *Mich Ass'n of Governmental Employees*, 125 Mich App at 183-185, the commission, at the behest of the State Employer, rescinded a five-percent wage increase and the addition of vision benefits for some state classified employees. This Court ruled that the commission had the authority to rescind and defer the proposed increase even after it was considered by the Legislature. *Id.* at 187. In the present case, there is no evidence that a process of negotiation was even attempted between the commission and the Legislature to achieve cost savings.[3]

Defendants contend that the Legislature acted appropriately because MCL 38.35 merely represents a deduction similar to deductions for health insurance and taxes. However, deductions for health insurance are, to some extent, controlled by the civil service employee. That is, the employee decides whether to accept this benefit of employment and the type of plan from those available, thereby controlling the amount of the deduction. Taxes imposed by the federal government and the state government are standard rates that apply on the basis of income levels. In the present case, civil service employees were not given the option of participating in the retiree health care funding act.

---

[3] At oral argument, defendants asserted that the Legislature enacted the retirement system and has maintained authority over the system for the last 40 years. Therefore, defendants alleged that plaintiffs seek to invalidate the retirement system as a whole. On the contrary, any decision regarding MCL 38.35 is not an assault on the collective retirement system. Rather, the litigation is limited to addressing the validity of the *process* of removing three percent of employee compensation and directing it to retiree health care without regard to Const 1963, art 11, § 5.

Moreover, there is no correlation between the three percent reduction in compensation for individual civil service employees and the contribution into the system. That is, there is no escrow of the individual's contribution into a fund for that individual. Plaintiffs contend, and defendants do not dispute, that the vast majority of the three percent compensation reduction is being utilized to fund benefits for current retirees, and is not being reserved for current employees. Curiously, unlike the prior statutory versions of MCL 38.35 that set aside the reduction in compensation into a savings fund in perpetuity, the present version of MCL 38.35 has a sunset provision of nearly three years. Defendants do not dispute plaintiffs' assertion that the nearly three-year period of the deduction from compensation of MCL 38.35 will raise $225 million or the amount necessary to fill a budgetary gap. Indeed, defendants present no explanation for the sunset provision.

Defendants also submit that the prior versions of the retirement act, repealed in 1974, existed without constitutional challenge. However, the fact that a constitutional challenge did not occur is not dispositive. As noted in the context of taxation issues, "[i]t is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it." *Walz v City of New York Tax Comm*, 397 US 664, 678; 90 S Ct 1409; 25 L Ed 2d 697 (1970). The fact that the prior versions of MCL 38.35 were not the subject of a constitutional challenge does not render them constitutional. *Walz*, 397 US at 678. Furthermore, the prior versions of the savings fund retirement deduction contained an express provision holding that employees had agreed to the reduction in wages, see MCL 38.36 repealed in 1974. The current version of the retirement act, MCL 38.35, contains no

similar provision, and there was no negotiated agreement with classified civil service employees.[4]

Defendants also contend that the will of the people must be examined with regard to the passage of MCL 38.35 and that the people would approve of state workers' being responsible for retirement costs. The people did not vote on and ratify the terms and conditions of MCL 38.35. Rather, the will of the people was expressed in Const 1963, art 11, § 5. There, the people ratified a system of checks and balances where the CSC has plenary authority over classified civil servants with a process in place for legislative override. The people expect that that the system of checks and balances will be respected, and a review of Michigan caselaw reveals that the CSC and the executive branch have dealt cooperatively to address employee compensation in times of economic hardship. The people can and should expect shared sacrifice; however, it cannot come at the expense of constitutional nullification, and the Legislature cannot expect to balance the budget on the backs of state workers.

Const 1963, art 11, § 5 provides that the rates of compensation for all employees in the classified service are fixed by the commission. It further sets forth the process for a legislative override of any wage increase submitted to the Governor by legislative vote of two-thirds of the members serving in each house. In the present case, the Legislature did not achieve its goal of preventing the wage increase in accordance with the constitutional provisions. Therefore, it enacted MCL

---

[4] Defendants also rely on the fact that the three percent deduction applies to all employees. We only decide actual controversies, *Shavers*, 402 Mich at 589, and the application of MCL 38.35 to other employees is not at issue in this appeal. Defendants' argument that the Legislature was acting for the benefit of the public health and welfare does not excuse the failure to comply with the Michigan Constitution.

38.35 to fill a budget deficit. When a statute contravenes the provisions of the Michigan Constitution, it is unconstitutional and void. *Pillon*, 345 Mich at 547. Accordingly, the trial court did not err by granting plaintiffs' motion for summary disposition and denying defendants' motion for summary disposition.

Affirmed.

BECKERING, P.J., and STEPHENS, J., concurred with FORT HOOD, J.